**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION**

**LEROY A. FARRIS**                                                          **PLAINTIFF**

**V.**                            **No. 2:22-CV-00118-JM-PSH**

**KILOLO KIJAKAZI,
ACTING COMMISSIONER of
SOCIAL SECURITY ADMINISTRATION**                          **DEFENDANT**

## RECOMMENDED DISPOSITION

This Recommended Disposition (Recommendation) has been sent to United States District Judge James M. Moody, Jr. Either party may file written objections to this Recommendation. Objections should be specific and should include the factual or legal basis for the objection.

To be considered, objections must be received in the office of the Court Clerk within 14 days of this Recommendation. If no objections are filed, Judge Moody can adopt this Recommendation without independently reviewing the record. By not objecting, parties may also waive the right to appeal questions of fact.

I.    **Introduction**:

Leroy Farris applied for disability benefits on November 13, 2019, alleging disability beginning June 16, 2019. (Tr. at 14). His claims were denied both initially and upon reconsideration. *Id*. After conducting a hearing, an Administrative Law Judge ("ALJ") denied his application on May 5, 2021. (Tr. at 28). The Appeals

1

Council later denied Mr. Farris' request to review the decision. (Tr. at 1). Therefore, the ALJ's decision stands as the final decision of the Commissioner.

Mr. Farris now seeks judicial review of the decision. For the reasons stated below, the Court recommends that the decision be reversed and remanded for further administrative review.

**II.   <u>Background and Relevant Medical History:</u>**

Mr. Farris filed for disability benefits in November 2019 based on limited function and pain in both of his arms. (Tr. at 260, 274-81). Mr. Farris testified that, in 2009, he sustained multiple fractures in an ATV accident that left him with extensive hardware, and limited mobility, in his left arm. (Tr. at 87). Then, in June 2019, Mr. Farris shattered his right elbow in another ATV accident, requiring surgery. (Tr. at 393). Following the second accident, Mr. Farris reported needing assistance with cooking, cleaning, and personal care tasks like bathing and dressing himself. (Tr. at 274-81). Mr. Farris also reported problems with memory and concentration, and the record contains a 2007 intellectual assessment indicating his full scale IQ is 58, corresponding to "mild mental retardation" (now termed "intellectual disorder"). (Tr. at 328-29).

Mr. Farris submitted medical records from: (1) his June 2019 surgery and follow-up orthopedic appointments through February 2020; and (2) two full rounds of physical/occupational therapy between September and December 2019. Those

records show that in June 2019 Mr. Farris suffered a comminuted intra-articular fracture of the right distal humerus. (Tr. at 393, 402, 409). In other words, the bone had broken into multiple pieces at and above the elbow joint. He underwent open reduction internal fixation of the distal humerus. (Tr. at 408). Multiple plates and screws were placed in his arm. He was non-weightbearing in the right arm until September 10, 2019, when he reported minimal pain and was cleared for progressive weightbearing. (Tr. at 429).

Occupational therapist Meagan Mullins evaluated Mr. Farris on September 5, 2019. (Tr. at 373, 388). She noted that he was unable to bend his elbow to 90 degrees flexion, required assistance with dressing, and was unable to feed himself with his right (dominant) arm. After two full rounds of physical and occupational therapy, Mr. Farris' right elbow still was very stiff. Ms. Mullins opined that he "[would] only gain functional independence in his dominant UE [upper extremity] with surgical intervention," and recommended discharging him from therapy in December 2019. (Tr. at 338).

When Mr. Farris returned to the orthopedic clinic on December 12, 2019, his elbow range of motion was only 10-30 degrees. (Tr. at 435-36). X-rays showed that his fractures were healing but still visible. The imaging also showed heterotopic bone growth. An elbow CT scan was ordered to determine whether he would benefit from surgery to "remove bony block to motion." (Tr. at 442).

On February 20, 2020, eight months post-injury, Mr. Farris' CT scan results still showed several areas of incomplete union. A physical exam showed his elbow was limited to 10-45 degrees range of motion and "crepitus with what little ROM he ha[d]." (Tr. at 440). He was told that the incomplete union precluded surgery at that time, but surgery could still happen in the future to excise the heterotopic bone. He was instructed to follow up in two months for new x-rays.

These were the most recent medical records in the file at the time of Mr. Farris' telephone hearing with the ALJ on February 8, 2021, nearly a full year later. Apparently, while Mr. Farris' application was pending, the law firm representing him "abruptly shut down and went out of business." *Doc. 9 at 6*. At the hearing, Mr. Farris' attorney acknowledged that his requests for medical records had been delayed during his transition to a new law firm. (Tr. at 59-60).

However, just before the hearing, the attorney submitted a single page of discharge instructions from an apparent second surgery, dated January 22, 2021— two weeks earlier. (Tr. at 484). The attorney told the ALJ that he had requested updated records from the hospital, and he asked to hold the record open for 14 days to get them submitted. (Tr. at 60). Although the ALJ granted the request, those records apparently were never submitted. There are still no records from that surgery or from any associated hospital stay in the file, nor are there any 2020 clinical records

that might shed light on Mr. Farris' condition during the 11 months preceding surgery.

The hearing continued with Mr. Farris' testimony. He told the ALJ that he had attended doctors' appointments to treat his right arm every month since his accident. He reported that he needed help putting on his clothes, taking a shower, and feeding himself. When the ALJ asked him how many pounds he could lift and carry, Mr. Farris replied, "Zero." (Tr. at 65). Soon, it became clear that Mr. Farris actually was calling into the hearing *from* a doctor's office, and the ALJ was forced to cut the hearing short due to privacy concerns. (Tr. at 66, 71). A second hearing was rescheduled for April 22, 2021. (Tr. at 69).

Shortly before the second hearing, Mr. Farris' attorney submitted a two-page surgical follow-up record dated March 29, 2021, and a medical source statement from Susan Balke, D.O., dated March 1, 2021. (Tr. at 486-91). He submitted no other records.

The surgical follow-up record, from orthopedic surgeon Norfleet Thompson, M.D., briefly describes Mr. Farris' pertinent medical history. (Tr. at 486). Dr. Thompson wrote that Mr. Farris "developed significant post-traumatic elbow stiffness with some heterotopic ossification" after his injury and underwent "contracture release/HO excision/ulnar nerve transposition" surgery on January 22, 2021. *Id*. Afterwards, Mr. Farris developed a postoperative MRSA infection, and he

5

underwent another surgery on February 8, 2021—the same day as the first ALJ hearing—to treat it. Dr. Thompson's notes indicate that Mr. Farris was "currently in PT"; that his elbow was "still stiff with infection reducing effectiveness of prior release"; and that he was developing post-traumatic osteoarthritis. *Id*. On exam, Mr. Farris' elbow range of motion still was only 10-40 degrees. Although Dr. Thompson planned a progressive splinting trial, he opined that Mr. Farris "will have permanent impairment with significant loss of motion." *Id*.

Mr. Farris' primary care doctor, Dr. Susan Balke, filled out a medical source statement on March 1, 2021, assessing significant physical and mental limitations. (Tr. at 488-91). She opined that Mr. Farris was limited to lifting and carrying less than 10 pounds even occasionally; standing or walking for a total of two hours per workday; sitting for two hours per workday; taking frequent breaks; climbing, squatting, kneeling, crouching, bending, and stooping less than 2.5 hours per workday; balancing for one-third of the work day; reaching, handling, fingering, gripping, and feeling less than 2.5 hours per workday; avoiding all exposure to temperature extremes and hazards; and no driving as part of work duties. She also opined that Mr. Farris could not maintain attention, concentration, reliability, and pace on a sustained basis to work full time. Yet, there are no treatment records from Dr. Balke in the record.

With these additional six pages of records, Mr. Farris' attorney told the ALJ that the record was "up-to-date and complete." (Tr. at 80). Mr. Farris then resumed his testimony. He told the ALJ that a nurse was currently coming to his home five days a week to help him bathe and to do chores, while a "therapy doctor" came to his home twice a week. (Tr. at 83). He reported that Dr. Thompson had given him an arm brace and was considering whether to perform yet another surgery. He told the ALJ that he cannot lift or carry anything with his right arm and was under doctor's orders not to do so.

Mr. Farris also reminded the ALJ of his left arm limitations. He explained that he'd had a prior accident in 2009, in which he'd broken bones in his left hand, wrist, finger, jaw, and nose. Mr. Farris said he had 12 screws in his left arm, as well as a pin "to hold the big bone together where the bones that's loose." (Tr. at 87). He testified to limited range of motion in the left arm, but he told the ALJ he is capable of holding a full gallon of milk with it. Mr. Farris' file does not contain any treatment records related to his left arm limitations.

### III.   **The ALJ's Decision:**

The ALJ issued an unfavorable decision on May 5, 2021. (Tr. at 14-28). Using the familiar five-step evaluation,[1] the ALJ found that Mr. Farris had not engaged in

---

[1] In the written decision, the ALJ determines: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; (4)

substantial gainful activity since his application date of November 13, 2019.[2] (Tr. at 16). At Step Two of the evaluation, the ALJ found that Mr. Farris has the following severe impairments: fracture of right upper extremity at the elbow and intellectual disability. (Tr. at 17).

After finding that Mr. Farris' impairments failed to meet or equal a listed impairment, the ALJ determined that Mr. Farris has the residual functional capacity ("RFC") to perform work at the light exertional level, except that he can: (1) lift and carry 20 pounds occasionally and 10 pounds frequently; (2) sit for 6 hours, stand for 6 hours, and walk for 6 hours; (3) push/pull as much as lift/carry; (4) occasionally operate hand controls with the right hand; (5) occasionally reach overhead to the right and frequently perform all other reaching to the right; (6) occasionally climb ramps, stairs, ladders, ropes, or scaffolds; (7) occasionally crawl; (8) have occasional exposure to vibration; (9) perform simple, routine tasks with simple work-related decisions; and (10) occasionally interact with supervisors, coworkers, and the public. (Tr. at 19-20).

---

if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. § 416.920(a)-(g).

[2] For supplemental security income claims, the relevant time period begins on the date the application was filed. 20 C.F.R. §§ 416.335, 416.920.

At Step Four, the ALJ found that Mr. Farris had no past relevant work. (Tr. at 25). At Step Five, relying on the testimony of a vocational expert ("VE"), the ALJ found that Mr. Farris' age, education, work experience, and RFC would allow him to perform jobs existing in significant numbers in the national economy, including jobs such as mail clerk, folder, and sorter. (Tr. at 26-27). Therefore, the ALJ concluded that Mr. Farris is not disabled. (Tr. at 27).

## IV. <u>Standard of Review</u>:

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

The United States Supreme Court has held that "whatever the meaning of 'substantial' is in other contexts, the threshold for such evidentiary sufficiency [in Social Security Disability cases] is not high. Substantial evidence . . . is more than a

mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. *Miller*, 784 F.3d at 477.

## V.   <u>Discussion</u>:

Mr. Farris contends that substantial evidence does not support the ALJ's decision to deny benefits. He argues that the ALJ: (1) failed to fully and fairly develop the record; (2) erred in assessing the credibility of his subjective complaints; (3) erred in determining his RFC; and (4) failed to properly evaluate his intellectual disability. After reviewing the record as a whole, the Court agrees with Mr. Farris that the ALJ's decision should be reversed, and that this case should be remanded for further development.

Mr. Farris' first and primary argument concerns the ALJ's failure to develop the record. He asserts that the case file is missing multiple records concerning his physical impairments, including: (1) records from the January 2021 surgery and hospitalization; (2) medical records from Dr. Balke, his primary care doctor; (3) any

and all medical records related to his left arm impairment; and (4) records from the home health nurse assisting him with personal care and activities of daily living ("ADLs") five days per week. He also contends that the record was not fully developed with respect to his mental impairments. The Commissioner responds that it was Mr. Farris' burden to obtain the medical records himself or to ask the ALJ to obtain them via subpoena, and that the ALJ was entitled to rely on Mr. Farris' attorney's assurances that the record was complete.

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. The ALJ's duty to develop the record extends even to cases like [this one], where an attorney represented the claimant at the administrative hearing." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). The ALJ hearing is non-adversarial, and the Commissioner's goal should be "that deserving claimants who apply for benefits receive justice." *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994) (quotation and citation omitted). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008).

The ALJ should have been particularly diligent about ensuring the completeness of the evidentiary record in this case. He already had recognized, based on Mr. Farris' evident confusion surrounding the first hearing, that "maybe Mr.

Farris didn't always understand what was happening . . . ." (Tr. at 78). He also knew that Mr. Farris' attorney was having trouble updating Mr. Farris' medical records. At the February 8, 2021 hearing, Mr. Farris' attorney asked the ALJ for more time to submit additional records from Regional One Health, which is both where Mr. Farris was receiving outpatient orthopedic treatment and where Dr. Thompson had performed the second surgery. (Tr. at 59). When those records ultimately failed to materialize, the ALJ should have inquired about them further. The ALJ was not entitled to rely on the attorney's statements that no records were missing because the ALJ knew (or should have known) those assurances were incorrect. By failing to obtain the missing records, the ALJ issued a decision based on a record he knew was incomplete. As a result, the ALJ's credibility and medical findings—and thus the RFC—are not supported by substantial evidence.

Part of determining a claimant's RFC requires the ALJ to assess the credibility of the claimant's subjective complaints. The ALJ's credibility analysis is guided by the *Polaski* factors, which include "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010) (quotation omitted) (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)). Although a lack of supporting medical evidence is another factor the ALJ should consider, "the ALJ may not

discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence." *Id*. at 931-32. "Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, we will defer to [the ALJ's] decision." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (internal quotation omitted).

Here, the ALJ discounted the credibility of Mr. Farris' testimony based solely on (1) Mr. Farris' reports of improvement in 2019 and (2) a lack of corroborating medical evidence in the record. The ALJ's failure to obtain the missing records undermines both of the reasons offered to support his decision.

The only "documented accounts of improvement throughout the period" that the ALJ noted are Mr. Farris' reports of "progressive improvement of upper extremity use/function" between June and December 2019. (Tr. at 22). Although the ALJ acknowledged that Mr. Farris had "reached a plateau with elbow range of motion and physical therapy" by early 2020, he emphasized that there was "no indication for any additional follow-up or specific treatment following the February 2020 orthopedic follow-up visit." *Id*. But the ALJ *knew* that Mr. Farris' condition ultimately required "follow-up" surgery, which significantly contradicts the earlier reports of improvement. Common sense dictates that if Mr. Farris' condition warranted additional surgical intervention, there are inevitably medical records that will explain *why*—and it wasn't because of "progressive improvement."

The potential for the missing records to provide corroborating medical evidence is self-explanatory. But the Court also notes that the existing evidence in the record does not fully support the ALJ's conclusion that Mr. Farris' complaints were "outweighed by objective evidence, including physical exams [and] related radiographic imaging . . . which are negative for abnormalities to suggest the same degree of limitation in function as testified to by [Mr. Farris] at the hearing." (Tr. at 23). The only finding that the ALJ made regarding radiographic imaging was that it showed Mr. Farris' hardware kept his fractures in stable anatomic alignment. Notably, the ALJ's decision omits any discussion of the multiple x-rays showing heterotopic bone growth—which was (presumably) removed during his January 2021 "HO excision" surgery. The ALJ also fails to address the imaging that showed Mr. Farris' fractures still had not healed eight months post-injury.[3] The ALJ's failure to discuss these abnormalities only further undermines his credibility assessment.

The Commissioner offers alternative justifications to support the ALJ's conclusion, but they are not convincing. For instance, the Commissioner argues that Mr. Farris received conservative treatment following surgery, which weakens his

---

[3] This latter omission is particularly puzzling. At both hearings, Mr. Farris' attorney and the ALJ acknowledged that the listed impairment most relevant to Mr. Farris' case is Listing 1.23 (formerly Listing 1.07): Non-healing or complex fracture of an upper extremity. (Tr. at 61, 76-77, 81). Yet, the only physical listing the ALJ considered in his decision was Listing 1.18: Abnormality of a major joint(s) in any extremity. Because Mr. Farris has not raised this issue on appeal, the Court does not address whether the evidence could support a finding that Mr. Farris met or equaled Listing 1.23.

claim of total disability. To the contrary, the record shows that numerous treatment modalities were unsuccessful, and Mr. Farris eventually faced additional surgeries— the surgeries that would have been reported in the missing records, had they been reviewed. The Commissioner also contends that Mr. Farris' admitted daily activities support the ALJ's credibility finding, but this argument is meritless. The ALJ did not find that Mr. Farris could manage his personal care independently, prepare simple meals, or shop in stores without assistance. In fact, the ALJ appears to have conceded that Mr. Farris' reported activities supported his complaints. (Tr. at 23).

The Commissioner also indicates that Mr. Farris' "noncompliance" played a role in the ALJ's credibility decision. The Commissioner points to a clinical note from October 31, 2019, which states: "We will give [Mr. Farris] another referral for PT as I don't think he has actually been doing it. I can find no recent PT notes since June." (Tr. at 432). But the ALJ did not reference this note in his written decision— and, more importantly, the author of that clinical note was mistaken; therapy records show that Mr. Farris already had completed 18 therapy visits "with little to no improvement" by October 21—ten days earlier. (Tr. at 365-66). The ALJ's decision does address a clinical note from August 13, 2019, wherein Mr. Farris reported that he had not attended physical therapy and was not performing many at-home exercises to improve his range of motion. (Tr. at 426). But Mr. Farris' initial delay in beginning therapy is not necessarily attributable to intentional noncompliance,

15

and this clinical note alone is certainly not enough to negate his subjective complaints.

In sum, the ALJ failed to provide good reasons for the decision to discount Mr. Farris' testimony, especially in light of the missing medical records. The information those records contain is significant and could very well influence the ALJ's credibility determination.

The ALJ's failure to obtain the missing records similarly undercuts his treatment of the medical opinion evidence. The ALJ rejected Dr. Balke's medical opinions largely because the restrictions she describes are "out of proportion to the documented exam findings" and contradict "the limited medical evidence in the file and indication of close to a yearlong lapse of treatment or any related follow-up after February 2020." (Tr. at 25). For the reasons already discussed, the ALJ should re-visit his evaluation of Dr. Balke's medical opinions once he obtains the missing records.

On remand, the ALJ should also develop the record with regard to Mr. Farris' alleged left arm impairment. The Court is mindful that Mr. Farris bears the burden of establishing his medically determinable impairments. *Bowen v. Yuckert*, 482 U.S. 137, 145-46 (1987). However, Mr. Farris specifically alleged a left arm impairment in his initial application, in later stages of appeal, in his function report, and in his hearing testimony. (Tr. 87, 260, 274-81, 287). The ALJ was therefore duty-bound to

assist him in developing the record. *See* Social Security Ruling ("SSR") 16–3p, 2017 WL 5180304, at \*4 ("[W]e may have insufficient evidence to determine whether an individual has a medically determinable impairment that could potentially account for his or her alleged symptoms. In those instances, we develop evidence regarding a potential medically determinable impairment using a variety of means set forth in our regulations."); 20 C.F.R. § 416.912(a)(1) ("We will consider only impairment(s) *you say you have* or about which we receive evidence.") (emphasis added).

Finally, Mr. Farris argues that the ALJ failed to develop the record with respect to his intellectual disorder, resulting in a "seriously flawed" evaluation of his mental impairment at Step Three. The ALJ considered Listing 12.05 for intellectual disorder and found that Mr. Farris had failed to demonstrate significant deficits in adaptive functioning that began prior to age 22. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05B. The ALJ also found that Mr. Farris had no more than "moderate" limitations across four areas of mental functioning.

The Court notes several errors in the ALJ's evaluation. For example, Mr. Farris' enrollment in high school special education classes is enough to demonstrate onset of his intellectual disorder prior to age 22. *Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007). Furthermore, the ALJ erred in finding that Mr. Farris lives alone and "presumably" handles financial responsibilities because "there is no evidence in the file that indicates otherwise." (Tr. at 19). Mr. Farris plainly testified that he lives

with others who help take care of him, and there is evidence in the record indicating that he does not, and could not, handle financial responsibilities without assistance. (Tr. at 86, 277, 329). The ALJ repeated these errors in discussing Mr. Farris' RFC. (Tr. at 23).

Despite these errors, it is unclear whether any additional evidence could demonstrate that Mr. Farris meets the criteria of Listing 12.05. On remand, however, the ALJ should consider whether additional, updated evidence is necessary to make a fully informed decision about the current functional effects of Mr. Farris' intellectual disorder, both at Step Three and in determining his RFC.

After reviewing the record as a whole, the Court finds that the ALJ's failure to obtain missing medical records tainted his assessment of Mr. Farris' credibility and his determination of Mr. Farris' RFC. The ALJ's decision is unsupported by substantial evidence, including necessary medical evidence. The Court therefore recommends that the ALJ's decision be reversed, and that this case be remanded for further development and administrative review.

## VI.   **Conclusion**:

Because the ALJ failed to fully and fairly develop the evidence regarding Mr. Farris' limitations, the Court finds that the decision is not supported by substantial evidence. The Court recommends that this case be reversed and remanded for further review.

IT IS SO ORDERED this 29th day of June 2023.

_____
UNITED STATES MAGISTRATE JUDGE